

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

July 12, 1993

Honorable David H. Cain
Chair
Committee on Transportation
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-234

Re: Construction of recent amendments to section 106.001(c)(2) of the Civil Practice and Remedies Code regarding a municipality's program to increase participation by minority business enterprises in public contract awards and related questions (RQ-516)

Dear Representative Cain:

You ask several questions about subsection (c) of section 106.001 of the Civil Practice and Remedies Code. Section 106.001 generally prohibits an officer or employee of the state or a political subdivision of the state acting in an official capacity from discriminating against a person on the basis of his or her "race, religion, color, sex, or national origin," including refusing to award a contract to the person. Civ. Prac. & Rem. Code § 106.001(a)(7). Subsection (c) provides an exception to this general prohibition for municipalities which adopt programs designed to increase the participation of "minority business enterprises"[1] in public contract awards.

First, you ask us to consider the effect of two recent amendments to section 106.001. In 1991, the legislature enacted two different versions of subsection (c)(2) of section 106.001. Prior to 1991, subsection (c)(2) provided as follows:

> Neither this section nor any home-rule charter to general law may be construed to prevent a home-rule municipality with a population of *900,000* or more according to the most recent federal census from adopting a program or programs designed to reasonably increase participation by minority business enterprises in public contract awards. If, as a part of a program describes by this subdivision, the governing body of such a municipality establishes a goal of having a certain percentage of its public contract awards made to minority business enterprises, the governing body shall use a

---

[1] In subsection (c), "minority business enterprises" means "businesses at least 51 percent of which are both owned and controlled in management and daily operations by minorities or women." Civ. Prac. & Rem. Code § 106.001(c)(1)(A). "Minorities" includes "blacks, Hispanics, Asian-Americans, American Indians, and Alaska natives." *Id.* § 106.001(c)(1)(B).

> qualified *independent source* to establish to what extent minority business enterprises in the municipality are available to receive awards for each of the various kinds of construction of public contracts that will be awarded. The percentage goal shall not exceed the availability of minority business enterprises in the municipality as determined by the *independent source*.

*See* Acts 1987, 70th Leg., ch. 1058, § 1, at 3590 (emphasis added).

The first amendment, which you refer to as amendment A, was enacted as part of Senate Bill 992. *See* Acts 1991, 72d Leg., ch. 597, § 56, at 2148. It was enacted on May 25, 1991, and became effective on September 1, 1991. *See id.* § 113, at 2158. The purpose of Senate Bill 992 was to change population figures in statutes that apply to political subdivisions with certain populations "so that the statutes continue to apply under the 1990 federal census to the same political subdivisions to which the statutes applied under the 1980 census." Senate Comm. on State Affairs, Bill Analysis, C.S.S.B. 992, 72d Leg. (1991). The amendment to subsection (c)(2) of section 106.001 of the Civil Practice and Remedies Code changed the italicized figure, "900,000," to "one million." Acts 1991, 72d Leg., ch. 597, § 56, at 2148. Senate Bill 992 also contained section 112(b) which provided as follows:

> To the extent that a law enacted by the 72nd Legislature, Regular Session, 1991, conflicts with this Act, the other law prevails, regardless of the relative dates of enactment or the relative effective dates.

*Id.* § 112(b), at 2158.

The second amendment, which you refer to as amendment B, was enacted as House Bill 338. *See* Acts 1991, 72d Leg., ch. 665, § 1, at 2423. It was enacted on May 16, 1991, and became effective on June 16, 1991. *See id.* § 2.[2] That amendment provides as follows:

> Neither this section nor any home-rule charter to general law may be construed to prevent a home-rule municipality that has a population of *465,000* or more according to the most recent federal census *or home-rule municipality located in a county containing:* (1) *a population of more than 465,000 according to the most recent federal census;* and (2) *more than 35 incorporated municipalities according to the most recent federal census* from adopting a program or programs designed to reasonably increase participation by minority business enterprises in public contract

---

[2]House Bill 338 contained an emergency clause providing that it would take effect "from and after its passage." Acts 1991, 72d Leg., ch. 665, § 2, at 2423.

> awards. If, as part of a program described by this subdivision, the governing body of such a municipality establishes a goal of having a certain percentage of its public contract awards made to minority business enterprises, the governing body shall use a qualified *in-house audit* to establish to what extent minority business enterprises in the municipality are available to receive awards for each of the various kinds of construction of public contracts that will be awarded. The percentage goal shall not exceed the availability of minority business enterprises in the municipality as determined by the *in-house audit*.

*Id.* § 1, at 2423 (emphasis added). House Bill 338 did not contain a provision similar to section 112(b) in Senate Bill 992.

First you ask, in essence, whether or not these two amendments conflict, and, if they do, which amendment prevails. We conclude that the two amendments conflict. While amendment A would extend subsection (c)'s exception to the general prohibition against discrimination in section 106.001 only to municipalities with a population of one million or more according to the most recent federal census, amendment B would extend it to municipalities with "a population of 465,000 or more according to the most recent federal census or home-rule municipalit[ies] located in a county containing: (1) a population of more that 465,000 according to the most recent federal census; and (2) more than 35 incorporated municipalities according to the most recent federal census." In addition, amendment A requires municipalities to use "a qualified independent source" to establish the extent to which minority business enterprises in the municipality are available to receive contracts awards, whereas amendment B would require municipalities to use "a qualified in-house audit" for this purpose.[3] Because amendment B extends the exception to a broader class of municipalities than does amendment A and uses the term "in-house audit" rather than the term "independent source" used in amendment A, the two amendments conflict.

We also conclude that, to the extent they conflict, amendment B prevails over amendment A. Section 112(b) of Senate Bill 992 expressly provides that to the extent that a law enacted by the 72d Legislature during its 1991 regular session conflicts with that act, which includes amendment A, the other law prevails, "regardless of the relative dates of enactment or the relative effective dates." As you point out, section 311.025(b) of the Code Construction Act provides that "if amendments to the same statute are enacted at the same session of the legislature, one amendment without reference to another, the amendments shall be harmonized, if possible, so that effect may be given to each. If the amendments are irreconcilable, the latest in date of enactment prevails." Gov't Code § 311.025(b). Under this rule, amendment A, the amendment with the later enactment

---

[3]The terms "independent source" and "in-house audit" clearly have different meanings. Whereas the term "independent source" refers to an entity outside a municipality, the term "in-house audit" refers to an audit performed by the municipality itself. *See* discussion *infra* p. 4.

date, would prevail; however, we believe that the Code Construction Act rule is inapplicable in these circumstances. Although this rule of statutory construction applies when conflicting amendments are silent on the issue, this is not the case here. In enacting section 112(b) of Senate Bill 992, the legislature clearly expressed its intent with regard to the proper course should a provision of that law and another law adopted in the same session conflict. The specific instructions in section 112(b) prevail over the more general rule expressed in section 311.025(b) of the Code Construction Act. Therefore, to the extent they conflict, amendment B prevails over amendment A.

Next, you ask what the term "in-house audit" means as used in subsection (c)(2) of section 106.001 of the Civil Practice and Remedies Code. Prior to 1991, subsection (c)(2) used the term "independent source." *See* Acts 1987, 70th Leg., ch. 1058, § 1, at 3590. The term "independent source" was replaced by the term "in-house audit" by House Bill 338 in 1991. *See* Acts 1991, 72d Leg., ch. 665, § 1, at 2423. The term "in-house audit" was introduced as part of a committee substitute bill. In explaining this aspect of the committee substitute bill, Representative Conley, the author of House Bill 338, stated that the setting of the percentage goal for minority business enterprise participation would "be done by in-house audit by the municipalities themselves." Hearings on H.B. 338 Before the House Comm. on Urban Affairs, 72d Leg. (March 4, 1991) (tape available through House Committee Coordinator). Therefore, we conclude that the term "in-house audit" means an audit conducted by a municipality itself.[4]

In addition, you ask about the following language in subsection (c)(2):

> If, as a part of a program described by this subdivision, the governing body of such a municipality establishes a goal of having a certain percentage of its public contract awards made to minority business enterprises, the governing body shall use a qualified in-house audit to establish to what extent minority business enterprises in the municipality are available to receive awards for *each of the various kinds of construction of public contracts* that will be awarded.

Civ. Prac. & Rem. Code § 106.001(c)(2) (emphasis added). You ask whether this provision "allows municipalities to set goals for all public contracts" or limits municipalities to "setting goals for public construction contracts." The meaning of the foregoing italicized language is unclear, but there is no other language in subsection (c)(2) that suggests the subsection is limited to public construction contracts. Indeed, subsection (c)(2) contains several references to "public contracts" with no modifying or limiting language. It is apparent from subsection (c)(2) as a whole that the legislature did not intend to limit municipalities to establishing a goal only for public construction contracts. *See Taylor v. Firemen's and Policemen's Civil Service Comm'n of Lubbock*, 616 S.W.2d

---

[4]We are not aware of any legislative history which would bear on the meaning of the term "qualified" in conjunction with the term "in-house audit."

187, 190 (Tex. 1981) (in statutory construction, one must look to the entire act to determine the legislature's intent with respect to specific provisions).

You also ask whether this provision allows municipalities to set different goals for different categories of contracts, such as utility, highway, and residential construction contracts. Again, subsection (c)(2) is unclear as to whether a municipality is limited to establishing one overarching goal or may establish many different goals. While the term "goal" appears only in singular form, the foregoing italicized language suggests that municipalities are authorized to consider different categories of contracts separately. To conclude that municipalities are limited to establishing one overarching goal would read this language out of the statute. Therefore, we conclude that subsection (c)(2) permits municipalities to set different goals for different categories of contracts. *See Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex. 1987) (in statutory construction, one should give effect to all words of a statute and not treat any statutory language as surplusage if possible).

You also ask about the following sentence in subsection (c)(2):

> The percentage goal shall not exceed the availability of minority
> business enterprises in the municipality as determined by the in-house
> audit.

Civ. Prac. & Rem. Code § 106.001(c)(2). You ask whether this provision limits the percentage goal "to *only* minority business enterprises with an office located within the city limits of the municipality" and whether minority business enterprises "whose offices are outside the city limits . . . but who are available to do work in the municipality, [can] be included in the percentage goal."

Taken by itself, the foregoing language is unclear whether the percentage goal must be based only on the availability of minority business enterprises *located* in the municipality, or whether it may also be based on minority business enterprises *available to perform work* in the municipality. This ambiguity is resolved, however, by the prior sentence of subsection (c)(2) which requires municipalities to "use a qualified in-house audit to establish to what extent *minority business enterprises in the municipality* are available to receive awards." *Id.* (emphasis added). Clearly, this sentence refers only to minority business enterprises located in the municipality. Therefore, we conclude that subsection (c)(2) does not authorize municipalities to take into account minority business enterprises which are not located in the municipality in establishing the percentage goal.[5]

---

[5]We note, however, that nothing in subsection (c)(2) would preclude a municipality from *considering bids* or *awarding* a contract to minority business enterprises which are not located in the municipality.

Finally, in light of Attorney General Opinion DM-113 (1992), you ask about subsection (c)(4) of section 106.001 of the Civil Practice and Remedies Code which provides as follows:

> General law or a home-rule charter that requires competitive bidding and the award of public contracts to the lowest responsible bidders is not affected by this subsection. However, all prospective bidders may be required to meet uniform standards designed to assure a reasonable degree of participation by minority business enterprises in the performance of any public contract.

In Attorney General Opinion DM-113, we concluded that exemptions from competitive bidding requirements must be expressly authorized by the legislature. *See* Attorney General Opinion DM-113 (1992) at 7. In light of this opinion, you ask whether "a bidder's failure to meet the 'uniform standards designed to assure a reasonable degree of participation by minority business enterprises in the performance of any public contract' [may] be considered as a factor in determining the bidder's responsibility." In essence, you ask whether the second sentence of subsection (c)(4) creates an exemption from competitive bidding requirements. Given that exemptions from competitive bidding must be express, we do not believe that section (c)(4) creates an exemption from competitive bidding. *See id.* We do believe, however, that the second sentence of subsection (c)(4) authorizes municipalities to refuse to accept bids from prospective bidders that fail to "meet uniform standards designed to assure a reasonable degree of participation by minority business enterprises." We base our conclusion on the use of the term "*prospective* bidders," which suggests that this provision is intended to permit a municipality to use such standards to screen bids. We also base our conclusion on the fact that were this not the case, this second sentence would merely be surplusage. *See Chevron Corp.*, 745 S.W.2d at 316 (in statutory construction, one should give effect to all words of a statute and not treat any statutory language as surplusage if possible).

## S U M M A R Y

To the extent a conflict exists between two amendments to section 106.001(c)(2) of the Civil Practice and Remedies Code enacted by the 72d Legislature, Acts 1991, 72d Leg., ch. 597, § 56, at 2148 and Acts 1991, 72d Leg., ch. 665, § 1, at 2423, the latter provision prevails.

The term "in-house audit" as used in subsection (c)(2) of section 106.001 of the Civil Practice and Remedies Code means an audit performed by a municipality itself. Subsection (c)(2) does not limit a municipality to establishing a percentage goal for contracts awarded to minority business enterprises only for public construction contracts. It permits a municipality to set different goals for different categories of contracts. Subsection (c)(2) does not authorize a

municipality to take into account minority business enterprises which are not located in the municipality in establishing the goal.

Subsection (c)(4) of the Civil Practice and Remedies Code does not create an exemption from competitive bidding requirements. It does, however, authorize municipalities to refuse to accept bids from prospective bidders that fail to "meet uniform standards designed to assure a reasonable degree of participation by minority business enterprises."

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Attorney General for Litigation

RENEA HICKS
State Solicitor

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Mary R. Crouter
Assistant Attorney General